UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
KAREN JEANETTE HUURMAN,          :

                    Plaintiff, :

          -against-             :        <u>MEMORANDUM & ORDER</u>

EMRIE BROOKE FOSTER,            :        07 Civ. 9326 (MHD)

                   Defendant. :
------------------------------X
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


     <u>Pro se</u> plaintiff Karen Huurman has moved for summary judgment
to establish her exclusive ownership rights in certain intellectual
property pursuant to the Copyright Act. Huurman seeks, in
substance, a declaratory judgment stating that she is the sole
copyright owner of a Chinese-language educational movie. She also
seeks a judgment declaring that a French-language educational movie
does not exist and that defendant Emrie Brooke Foster has no
copyright interest in certain intellectual property that plaintiff
created prior to or during the period in which the Chinese-language
movie was produced. Although defendant has not formally opposed the
motion, for the reasons stated below we deny it in its entirety and

<u>sua</u> <u>sponte</u> grant defendant summary judgment dismissing plaintiff's claims apart from the one regarding the Chinese-language movie.[1]

<u>Background and Prior Proceedings</u>

In 2003, defendant sought to create a company to produce a Chinese-language educational video because she wanted to teach the Chinese language to her daughter, who is half-Chinese. (Compl. at ¶ 21; Aff. of Pl. Karen Jeanette Huurman in Supp. of her Mot. for Summ. J., executed Aug. 14, 2008, Ex. G -- Tr. of Def.'s June 25, 2008 Dep., 31, 66-67). Foster invited Huurman, a childhood friend, to participate in the venture in order to provide Huurman with a source of income. (Huurman Aff., Ex. G at 7, 67). Specifically, Foster asked Huurman to film and edit the movie. (<u>Id.</u>, Ex. G at 67, 80).

Foster wrote a letter to Huurman dated August 23, 2003, expressing a desire to film the Chinese-language educational movie at Foster's home. (<u>Id.</u>, Ex. J at 2). The letter identified possible filming locations, and also mentioned a potential distributor for the film. (<u>Id.</u>). It suggested background music for the film and

---

[1] The parties have consented to our jurisdiction under 28 U.S.C. § 636(c).

indicated that a song would appear at the beginning of the movie and that the same song would play during the credits at the end. (Id., Ex. J at p. 5). The letter also stated that the profits from the film would be split evenly among plaintiff, defendant, and defendant's sister-in-law Yasue, in return for Yasue providing $3,000.00 to finance the film. (Id., Ex. G at 22, 24, 42, Ex. J at p. 2).[2] Attached to the letter was a sketch of a design for the cover of the DVD and a list of English words and their Chinese translations, with pronunciation guides accompanying some of the words. (Id., Ex. J at pp. 2-5). The list of words also included suggestions for visual representations of some of the terms, such as showing hands counting the numbers one through ten, and filming various colors being painted on a white canvas. (Id., Ex. J at pp. 4-5).

Apparently at approximately the same time that Foster sent Huurman this letter, Huurman, Foster and Foster's sister-in-law signed a document reflecting their agreement to be partners in the creation of the video, although no such document has been placed in

---

[2] It appears that no profits were realized from the production and sale of the film. (See id., Ex. G at 55, 102). Foster stated that no one was hired to create the Chinese-language film, but rather that the DVD was created as a partnership between Huurman, Foster and Foster's sister-in-law. (Id., Ex. G at 73).

the record on the current motion. (Id., Ex. G at 22-24). That partnership, named "Baby IQ Language", appears to have maintained an office in Huurman's Manhattan apartment and a mailing address at Foster's post-office box. (Id., Ex. G at 108).

In preparation for filming the Chinese-language movie, Foster testified, she applied for a business license, named the business "Baby IQ Language," and developed a logo which she attempted to trademark. (Id., Ex. G at 68). She also designed the cover for the DVD and compiled the list of Chinese terms that would be taught on the video, with the assistance of her aunt, who worked as a Chinese teacher. (Id., Ex. G at 67-68). Additionally, she composed a song to be included in the movie and made a costume to be worn in one of the scenes. (Id., Ex. G at 67). She also enlisted the assistance of her grandmother to make dolls to be used in the film. (Id.).

The movie, entitled "Learning Chinese and English Together," was initially filmed over the course of three days at Foster's home in Pennsylvania. (Id., Ex. G at 68). Subsequent voice recordings and re-takes were recorded at Huurman's apartment in Manhattan. (Id., Ex. G at 68-69). Foster acted in the movie along with her daughter and also recorded the English audio component of the movie. (Id., Ex. G at 68-69). Huurman's daughter Isabelle

4

apparently also appeared in the film. (Id., Ex. G at 96, 102). Foster's sister-in-law recorded the movie's Chinese audio component. (Id., Ex. G at 68). Huurman filmed the video and recorded its audio tracks. (Id., Ex. G at 68-69). Huurman also edited the film on her computer. (Id., Ex. G at 69-70). Although Foster was sometimes present during the editing process, she was apparently not actively involved in it. (Id., Ex. G at 70). The record is silent as to which party exercised final decision-making authority on the filming of the footage or what video and audio components were included in the finished product.

In November 2003, Foster signed a so-called "model release" for herself and her daughter. Foster and her daughter each granted Huurman "the irrevocable right to use my image, likeness, voice and name in all forms of media and in all manner, including electronic media and/or composite representations, for advertising, publicity, trade, or any lawful purposes connected with educational language videos." (Id., Ex. G at 121-22). Foster and her daughter also waived "any right to impact or approve the finished product, including written copy that may be generated in connection

therewith" and acknowledged that they had not received any payment. (Id.).[3]

The Chinese-language video was apparently completed sometime in 2005. (Id., Ex. G at 107).[4] It was marketed through a distribution company pursuant to an agreement that both Huurman and Foster reportedly signed, although the agreement has not been placed into the record. (See id., Ex. G at 25). DVDs of the film were also sold directly to consumers, apparently through a website maintained by Huurman and Foster, as well as in local stores. (Id., Ex. G at 51, 57, 108). Foster was responsible for shipping copies of the DVDs to customers who purchased them online or through the distribution company. (Id., Ex. G at 54-56). The movie was also advertised for sale on the website Amazon.com, although evidently without Foster's knowledge. (Id., Ex. G at 46). In that advertisement, plaintiff is listed as the "star" and "director" of

---

[3] Foster and her daughter signed similar releases in January 2006, although it is unclear whether these releases pertained to the Chinese-language video. (Id., Ex. G at 123-24). The 2006 releases principally differ from those signed in 2003 in that they do not specifically refer to the use of images and related content in educational language videos, but rather permit the use of such content for all lawful purposes. (Id.).

[4] Although neither party has provided a publication date for the movie, we infer that it was published in 2005 based on an advertisement for the film that has been placed in the record on the current motion. (See id., Ex. G at 107).

the movie. (<u>Id.</u>, Ex. G at 107).[5] There is no indication of whether plaintiff or defendant were listed as the author of the video in other advertisements or in the DVD packaging, although it does not appear that any authorship information was included on the front cover of the DVD. (<u>See</u> Huurman Aff., Ex. G at 93).

On March 3, 2005 Huurman obtained a Certificate of Registration from the United States Copyright Office for the audiovisual work "Learning Chinese and English Together." The registration indicates that Huurman was the author of "all video footage, sound recording and visual design, sounds, artwork and effects" in the video. (<u>Id.</u>, Ex. G at 94-95). Foster was unaware that Huurman had registered this copyright. (<u>Id.</u>, Ex. G at 13-16, 64-65).

On March 11, 2005 Foster obtained a Certificate of Registration from the United States Copyright Office for the "lyrics and music" for the song "Hello Hello", which appears in the "Learning Chinese and English Together" movie. (<u>Id.</u>, Ex. G at 118-

---

[5] The advertisement referred to Huurman as Karen Detrick, a name by which she is also known. (<u>See</u> <u>id.</u>, Ex. G at 17-18, 96; Compl. at ¶ 1).

19).[6] Foster stated that Huurman completed the registration form on her behalf and gave it to her to sign. (Id., Ex. G at 63-64).

In August 2006 Foster, Huurman and their partnership known as Baby IQ Language received a demand letter from The Brainy Baby Company, LLC alleging that Baby IQ Language was infringing on the company's trademark "BABY IQ". (Id., Ex. G at 113-14). In December 2006 Foster, Huurman and Baby IQ Language signed a settlement agreement to resolve the trademark claim. (Id., Ex. G at 108-12). Under the terms of the agreement, Baby IQ Language retained the right to market and sell its existing inventory of its "Learning Chinese and English Together" DVDs for one year and one day after the effective date of the settlement agreement. (Id., Ex. G at 108). Any DVDs distributed after the effective date of the agreement had to bear a disclaimer indicating that "BABY IQ" is a registered trademark of The Brainy Baby Company, LLC and that that company is not affiliated with the movie. (Id., Ex. G at 108-09). The agreement also required that Baby IQ Language abandon the use of its URL www.babyiqlanguage.com or redirect visitors from that site to another website with a URL that did not include the term "babyiq", and that it not renew the URL when it expired in October

---

[6] Foster recited at least a portion of the lyrics to the song during her deposition. (See id., Ex. G at 67).

8

2010. (Id., Ex. G at 109-10). Furthermore, any web sites or promotional materials used to advertise and market the "Learning Chinese and English Together" DVDs during the one-year period following the effective date of the agreement had to contain a disclaimer reflecting The Brainy Baby Company, LLC's claim to the trademark "BABY IQ" and the fact that The Brainy Baby Company was not affiliated with the movie. (Id., Ex. G at 109).

Early in 2007, Foster began the process of changing the name of the Baby IQ Language partnership to the Clever Elephant. (Id., Ex. G at 60-61). She obtained the domain name www.clever-elephant.com and used the website to market the existing inventory of the "Learning Chinese and English Together" DVDs pursuant to the terms of the settlement agreement with The Brainy Baby Company, LLC. (Id., Ex. G at 60, 115). The record suggests that there may have been a dispute between Huurman and Foster as to whether this name change reflected a dissolution of the Baby IQ Language partnership, or merely a re-naming of the partnership to comply with the terms of the settlement agreement. (See id., Ex. G at 61, 116).

Apparently on March 1, 2007 Foster sent an e-mail to Huurman expressing her belief that Huurman had granted or intended to grant

9

her a license to use Huurman's intellectual property to further the Clever Elephant business, although that message is not included in the current record. (See id., Ex. G at 96). In response, Herb Detrick, Esq., an attorney whose firm "advises and represents Karen J. Huurman . . . in matters relating to her business affairs", sent Foster an e-mail dated March 2, 2007 to "correct [her] misunderstanding" about her right to use Huurman's intellectual property. (Id.).[7] The e-mail indicated that Huurman had not granted Foster any right to use her intellectual property or the name or likeness of her daughter except for the "very limited implied-at-law license" necessary to sell the remaining inventory of the "Learning Chinese and English Together" DVDs pursuant to the terms of the settlement agreement with The Brainy Baby Company, LLC. (Id., Ex. G at 96). The e-mail further stated that Huurman had only agreed to be involved in business activity with Foster to the extent necessary to comply with the terms of the December 2006 settlement agreement. (Id.). The e-mail concluded with a disclaimer that it was not purporting to render legal advice and a suggestion that Foster seek the advice of independent legal counsel. (Id., Ex. G at 96-97).

---

[7] Mr. Detrick is also apparently Huurman's brother. (See id., Ex. G at 19).

10

Huurman followed up this message with a March 8, 2007 e-mail to Foster in which she addressed the possibility of future business dealings between the women. She indicated that she intended to concentrate on regaining her photography and videography clients to avoid "another year of making no money." (Id., Ex. G at 106). She also stated that she had told Foster previously that she would "not be doing anything for Clever Elephant" until Foster got "all [her] ducks in a row" but that when Foster was "ready" the women could "talk and figure out if we can do anything new together." (Id.). She also suggested that Foster get advice about setting up a business from an attorney, accountant or non-profit organization that provides free business advice. (Id.).

In May 2007 Foster wrote Huurman a letter enclosing paperwork connected with Baby IQ Language that Huurman and her brother had requested and a check for $791.25 to reimburse Huurman for expenses that Huurman had incurred in connection with the Baby IQ Language partnership. (Id., Ex. G at 100-01. See also id., Ex. G at 120). In that letter Foster indicated that she still had ten boxes of the "Learning Chinese and English Together" DVDs that she hoped to sell and that she would use the profits to reimburse herself for her expenses and then share any remaining profits with Huurman. (Id., Ex. G at 101-02). Foster also requested that Huurman provide her

"the master copy of Chinese and English Together". (<u>Id.</u>, Ex. G at 102). She indicated that if Huurman did not want to edit the movie she could do it, and also indicated that she was willing to remove Huurman's daughter from the footage, apparently in response to a request from Huurman's brother. (<u>Id.</u>).

Foster's letter also referenced French and Spanish recordings that she and Huurman had made, apparently in preparation for the creation of French and Spanish-language educational movies. (<u>Id.</u>, Ex. G at 103).[8] These recordings were evidently made in the beginning of 2006 in New York City, and paid for with a check from the Baby IQ Language partnership. (<u>Id.</u>, Ex. G at 44). Huurman also apparently filmed footage for these movies when she was in Florida on vacation, where both Foster's and Huurman's parents live, and when she was visiting her friends and family in Paris. (<u>Id.</u>, Ex. G at 72-73). Foster also filmed footage for the videos when she was in Spain for a modeling job. (<u>Id.</u>, Ex. G at 73). Foster requested that, if Huurman did not want to make the French-language movies, she provide Foster with "the recordings of French-English-Spanish".

---

[8] Huurman's complaint indicates that "in or about 2005" she and Foster "began making plans to prepare the . . . French DVD for distribution to the public." (Compl. at ¶ 24). Evidently Foster's sister-in-law was not involved in the creation of the French or Spanish-language movies. (<u>See</u> Huurman Aff., Ex. G at 75).

(<u>Id.</u>, Ex. G at 103). However, Foster also stated that she hoped that Huurman would let her make copies of "the new French [movie]" to sell in 2008. (<u>Id.</u>). She also requested a single copy of the DVD for herself and her daughter because it included footage of her relatives and a recently-deceased pet. (<u>Id.</u>).

Huurman e-mailed Foster on June 15, 2007 to express her regret that the woman could not "come to an agreement." (<u>Id.</u>, Ex. G at 116). She stated that they had "dissolve[d] the company" because "[d]issolving the partnership ended the company." (<u>Id.</u>). She also stated that she was "very clear" that she did not want to participate in the business anymore and that she was not interested in "licensing [her] IP for a percentage." (<u>Id.</u>).

On July 31, 2007 Jan S. Lokuta, Esq. wrote a letter to Huurman on Foster's behalf. He stated that his firm "represents Emrie Foster in an ongoing dispute with you" and indicated his understanding that Huurman had "failed or refused to return to [Foster] the master copy of Learning Chinese and English [T]ogether." (<u>Id.</u>, Ex. G at 98).[9] Lokuta stated that he had reviewed pertinent documents which indicated that the master copy

---

[9] Lokuta was representing Foster in her divorce proceeding. (<u>Id.</u>, Ex. G at 21).

13

of the DVD belongs to "the Corporation" and that Foster is entitled to the master copy. (Id., Ex. G at 98). He requested that the master copy be sent to him and noted that "[f]ailure to do so will result in the bringing of an [a]ction to retrieve this item." (Id.).

In reply to this letter, Huurman wrote to Foster on September 24, 2007. The letter recited that she was enclosing "[a] copy of the French/Spanish/English audio recording[,] . . . [a] mini-DV tape of footage from your trip to Spain[,] . . . [and a] mini-DV tape of your brother playing the piano." (Id., Ex. G at 105).

On October 3, 2007 Foster's attorney, Mr. Lokuta, wrote to Huurman's attorney, Mr. Detrick, reiterating Foster's request for the return of the master copies of two audio visual discs entitled "Learning Chinese and English Together" and "Learning French and English Together". (Id., Ex. G at 99). Mr. Lokuta indicated that Foster "has received only three audio voice overs with no visual. This is not what she was seeking, [and] not what your client was to provide." (Id.). Mr. Lokuta stated that Huurman's failure to send Foster the master copies of the Chinese and French DVDs would "require us to litigate this matter to retrieve these items." (Id.).

On October 18, 2007 Huurman filed a <u>pro</u> <u>se</u> complaint in this court, seeking a declaratory judgment that Foster "is not, and never has been, the owner, pursuant to the Copyright Act, of the Master IP", otherwise known as the Chinese-language movie. (Compl. at "wherefore" clause on p. 9). She also sought a declaration that she has never granted Foster "any present or future right, pursuant to the Copyright Act, to reproduce or prepare derivative works of the Master IP" and therefore that Foster "has no right or entitlement to use the Master DVD for any purpose." (<u>Id.</u>; Compl. at "wherefore" clause on p. 14). Huurman also sought a declaratory judgment that "the alleged 'master copy' of the French DVD does not exist." (Compl. at "wherefore" clause on p. 14). Additionally, Huurman's complaint references "numerous other original creative expressions, including fashion magazine cover photographs, Internet website pictorials, and Country and Western song lyrics" that she created in 1999 and 2002. (Compl. at ¶ 8 & Ex. C).[10] She claims that she is the sole and exclusive owner of the copyrights to these works and seeks a declaratory judgment that Foster has no copyright interest in them. (<u>See</u> Compl. at ¶ 8 & "wherefore" clause on p. 9). Finally, she seeks an award of her costs and reasonable attorneys'

---

[10] In her affirmation in support of the current motion, Huurman describes this material as having been created in the period from August 2003 to August 2008. (Huurman Aff. at ¶ 28).

fees incurred in the matter. (Compl. at "wherefore" clauses on pp. 9 and 14).

Huurman now seeks summary-judgment on those claims. <u>Pro</u> <u>se</u> defendant Foster has not formally opposed the motion, although she did write to the court indicating that she wanted to maintain the company on her own and expressing a willingness to pay Huurman a percentage of any profit made from Huurman's contributions. (Letter to the Court from Emrie B. Foster dated Oct.7, 2008). However, she noted that she lacked legal experience and the funds to hire a lawyer and therefore would not be submitting a formal opposition to plaintiff's motion. (<u>Id.</u>). For present purposes, we deem this letter to be tantamount to an opposition.

<u>        ANALYSIS</u>

We first detail the standards by which we evaluate summary-judgment motions and requests for declaratory relief, and then address plaintiff's claims.

A. <u>Rule 56 Standards</u>

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Shade v. Hous. Auth. of the City of New Haven</u>, 251 F.3d 307, 314 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986); <u>see</u>, <u>e.g.</u>, <u>Anderson</u>, 477 U.S. at 255; <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 150-51 (2d Cir. 2000).

Courts review pro se pleadings and other filings carefully and liberally, interpreting them to "raise the strongest arguments that they suggest." See e.g., Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks omitted). This requirement is especially strong in the context of a summary-judgment motion, where a pro se party's claims or defenses are potentially subject to a final disposition. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

The party moving for summary judgment bears the initial burden of informing the court of the basis for her motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy her initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet her initial burden, however, the motion will fail even if

18

the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003). Furthermore, if the court concludes that the movant has failed to establish the existence of a material factual dispute requiring further proceedings and that the non-moving party is entitled to judgment as a matter of law, it may grant summary judgment to the non-moving party sua sponte. Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am., 419 F.3d 181, 190-91 (2d Cir. 2005); First Fin. Ins. Co. v. Allstate Interior Demolition Corp., 193 F.3d 109, 114-15 (2d Cir. 1999) (citing, inter alia, Celotex, 477 U.S. at 326).

If the moving party carries her initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); see, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor can she rely on his pleadings or on merely conclusory factual allegations. See, e.g.,

Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). She must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, she must present specific evidence in support of her contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).


B. Declaratory Judgment Standards


Plaintiff seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. Under that Act, "[i]n a case of actual controversy within its jurisdiction" the court "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).


A prerequisite to an award of declaratory relief under the Act is that the case present an "actual controversy", which means that

"'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" In re Prudential Lines Inc., 158 F.3d 65, 70 (2d Cir. 1998) (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)). If the controversy rests on a contingency that is unlikely to occur, it lacks the immediacy required for an award of declaratory relief. Id. (citing Certain Underwriters at Lloyd's v. St. Joe Minerals Corp., 90 F.3d 671, 675 (2d Cir. 1996)). Accord Jenkins v. United States, 386 F.3d 415, 417 (2d Cir. 2004) (noting that federal courts considering requests for declaratory relief "'must be alert to avoid imposition upon their jurisdiction through [parties] obtaining futile or premature interventions'") (quoting Pub. Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 243 (1952))).

In the context of copyright claims, courts in the Second Circuit apply a two-prong test to evaluate whether an "actual controversy" exists. "'First, the defendant's conduct must have "created a real and reasonable apprehension of liability on the part of the plaintiff."'" Cosa Instrument Corp. v. Hobre Instruments BV, __ F. Supp. 2d __, 2010 WL 1141385, *3 (E.D.N.Y. Mar. 26, 2010) (quoting Ritz Hotel, Ltd. v. Shen Mfg. Co., 384 F.

Supp. 2d 678, 682 (S.D.N.Y. 2005) (quoting <u>Starter Corp. v.</u> <u>Converse, Inc.</u>, 84 F.3d 592, 595 (2d Cir. 1996))). "'Second, the plaintiff must have "engaged in a course of conduct which has brought it into adversarial conflict with the defendant."'" <u>Id.</u> (quoting <u>Ritz Hotel, Ltd.</u>, 384 F. Supp. 2d at 682 (quoting <u>Starter</u>, 84 F.3d at 595)). This element is satisfied by a party having "'engaged in a course of conduct evidencing a definite intent and apparent ability to commence use of the allegedly infringing'" material. <u>Id.</u> at *4 (quoting <u>Starter</u>, 84 F.3d at 595-96) (additional internal quotation marks omitted). To support such relief, both elements must be present at the time when the action requesting declaratory relief is filed. <u>Id.</u> at *3.

    If an actual controversy exists between the parties, the decision to award declaratory relief is left to our discretion. <u>See</u> <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 286-87 (1995); <u>A & E</u> <u>Television Networks v. Genuine Entm't, Inc.</u>, 2010 WL 2308092, *1 (S.D.N.Y. June 10, 2010).[11] In exercising that discretion, we are

---

[11] We note that the court must also have an independent basis for exercising subject-matter jurisdiction over the case, as the Declaratory Judgment Act only establishes a court's authority to award declaratory relief in a case that is already "within its jurisdiction." 28 U.S.C. § 2201(a). <u>Accord</u> <u>Correspondent Servs.</u> <u>Corp. v. First Equities Corp. of Florida</u>, 442 F.3d 767, 769 (2d Cir. 2006) (per curiam).

instructed to evaluate "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005) (citing Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969)).


C. Plaintiff's Claims


We apply these standards to plaintiff's request for summary-judgment on each of her claims for declaratory relief.


1. The Chinese-language movie


Plaintiff seeks, in substance, a declaratory judgment establishing that she is the exclusive copyright owner of the Chinese-language educational movie entitled "Learning Chinese and English Together." Huurman contends that if Foster obtains possession of the master copy of the film, she will produce and distribute additional copies of it "in violation of Plaintiff's exclusive rights under the Copyright Act." (Compl. at ¶ 14).

Although we initially address plaintiff's request in the terms that she has presented it, we note that the gravamen of the dispute between the parties -- ownership of the master copy of the DVD -- is not necessarily related to ownership of the copyright to the motion picture that is contained on the DVD. See 17 U.S.C. § 202 ("Ownership of a copyright . . . is distinct from ownership of any material object in which the work is embodied."). Accord TeeVee Toons, Inc. v. DM Records, Inc., 2007 WL 2851218, *8 (S.D.N.Y. Sept. 27, 2007) (citing 1 Melville B. Nimmer & David Nimmer, 6 Nimmer on Copyright § 30.03 (2003)); Ulloa v. Universal Music & Video Distrib. Corp., 303 F. Supp. 2d 409, 412 (S.D.N.Y. 2004); Stuart & Sons, L.P. v. Curtis Pub. Co., Inc., 456 F. Supp. 2d 336, 340-41 n.5 (D. Conn. 2006). Therefore, we also read plaintiff's complaint liberally to request a declaratory judgment regarding ownership of the master copy of the DVD apart from any copyright claim, and we evaluate that request below.

(a) Request for declaration of copyright ownership

Turning first to plaintiff's stated request for a declaration resolving ownership of the copyright to "Learning Chinese and English Together", we must determine whether we have authority to declare the owner of the copyright to the motion picture under 28

24

U.S.C. § 2201. This raises the question of whether an actual controversy exists between the parties.[12] Regarding the first prong of the actual-controversy test, Foster has requested that Huurman provide her with the master copy of the Chinese-language DVD, and has threatened to file suit if Huurman refuses to do so. (Huurman Aff., Ex. G at 98, 99). On the basis of these demand letters, Huurman faces a real and reasonable threat of liability. See Starter Corp., 84 F.3d at 595; Cosa Instrument Corp., 2010 WL 1141385, at *4.

However, the record on the current motion is insufficient to establish the second element of the actual-controversy test as it pertains to plaintiff's copyright claim, namely that Foster possesses a "'definite intent and apparent ability to commence use of the allegedly infringing'" material. See Costa Instrument Corp., 2010 WL 1141385, at *4 (quoting Starter, 84 F.3d at 595-96)

---

[12] We note that we have subject-matter jurisdiction over the claim pursuant to 28 U.S.C. § 1338 because it "arises under" the Copyright Act by virtue of "'requiring construction of the Act.'" Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 349 (2d Cir. 2000) (quoting T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2d Cir. 1964)). See also Merchant v. Levy, 92 F.3d 51, 55 (2d Cir. 1996) (federal jurisdiction is proper in case involving "application and interpretation of the copyright ownership provisions") (internal quotation marks omitted); Lombardi v. Suares, 923 F. Supp. 51, 54 (S.D.N.Y. 1996) (deciding whether parties contributed to joint work is question of copyright law arising under Copyright Act).

(additional internal quotation marks omitted). In order to satisfy
this element, Huurman would need to show that Foster has the desire
and capability to distribute material that infringes on her
purportedly exclusive copyright in the "Learning Chinese and
English Together" motion picture. Defendant has expressed a desire
to continue operating a business on her own, and presumably her
intentions include distributing in some form the Chinese-language
DVD for which she has requested the master copy. (See, e.g., Oct.
7, 2008 Letter to Court at 1; Huurman Aff., Ex. G at 78-79).[13]
However, Foster has expressed her intention to "edit" the master
copy of the "Learning Chinese and English Together" DVD, including
potentially removing Huurman's daughter from the footage, prior to
distributing it. (Id., Ex. G at 22, 102). The extent of the editing
that Foster intends to undertake is unclear, and therefore, even if
we were to conclude that Huurman is the exclusive copyright owner
of the DVD in its current form, we could not determine whether
distribution of the edited film would infringe on that copyright,
or whether the edited film might constitute a non-infringing
derivative work.[14] See 17 U.S.C. § 101 (defining "derivative work"

---

[13] At the time of defendant's 2008 deposition, she claimed that
she was not the proprietor of any business and that she had
"closed [her business] down" because Huurman would not give her
the master copies of the DVDs. (Huurman Aff., Ex. G at 26-27).

[14] We presume that, at a minimum, some amount of editing would
need to be done to the previously-distributed version of the film

as "[a] work consisting of editorial revisions . . . or other modifications which, as a whole, represent an original work of authorship"); 17 U.S.C. § 103 (discussing copyright protection for derivative works). See generally Woods v. Bourne Co., 60 F.3d 978, 990-91 (2d Cir. 1995). Therefore, we cannot determine whether Foster intends to infringe on the copyright interest that Huurman has asserted.

Moreover, the current record is virtually silent as to Foster's capability for editing and distributing the video, and therefore we cannot determine that Foster has the ability to commence infringement of the exclusive copyright that Huurman claims to possess. In order to satisfy the second element of the actual-controversy test, a plaintiff must claim more than simply that the defendant has "a vague or general desire" to infringe a copyright. Starter Corp., 84 F.3d at 596. Accord Windsurfing Intern. Inc. v. AMF Inc., 828 F.2d 755, 758 (Fed. Cir. 1987) (determining that no actual controversy existed between the parties when one party desired to use an allegedly infringing trademark but had not actually used the mark) (applying Second Circuit law).

---

to remove references that we infer might exist on the DVD to "Baby IQ Language" to comply with the 2006 settlement agreement with The Brainy Baby Company, LLC. (See Huurman Aff. at ¶ 26 & Ex. G at 22, 93, 108-12).

27

Instead, the defendant must be "'actively preparing to produce the article in question. This is the last point before the point of no return.'" <u>Starter Corp.</u>, 84 F.3d at 596 (quoting <u>G. Heileman Brewing Co. v. Anheuser-Busch, Inc.</u>, 873 F.2d 985, 990 (7th Cir. 1989)). Here, defendant has established the Clever Elephant business and, at least at one time, operated a website in connection with that business. However, it is unclear whether this business was formed with the intention of distributing a newly-produced Chinese-language movie, or rather whether its primary focus was the liquidation of the existing inventory of "Learning Chinese and English Together" DVDs pursuant to the terms of the 2006 settlement agreement with The Brainy Baby Company, LLC, which plaintiff has apparently conceded did not infringe on her claimed copyright interest. (<u>See</u> Huurman Aff., Ex. G at 96).[15] Moreover, although Foster has asserted that she possesses the technical capability to edit the master copy of the DVD, her actual ability to do so is an open question based on Foster's desire to recruit someone to edit the initial film and her uncertainty about the technology that was used to edit that film. (<u>See</u> Huurman Aff., Ex.

---

[15] We note that at present the website associated with the Clever Elephant company, located at www.clever-elephant.com, lacks any content, except for what appears to be a logo associated with the company and a message indicating that "[w]e are changing our website and product. We'll get back to you soon."

G at 67, 70-71, 102). If Foster would require the assistance of a third party to copy or edit the master DVD prior to distributing it, there is no evidence in the record that she has arranged for such assistance. Similarly, the record does not reflect that Foster has secured a method for distributing a newly-edited version of the movie. Therefore, we cannot conclude that Foster has the capacity to begin infringing on Huurman's purported copyright in the relatively near future, as required to establish the existence of an actual dispute between the parties in the copyright context.

An additional factor that weighs against exercising our discretion to declare ownership of the motion picture's copyright is that doing so would not necessarily resolve the dispute between the parties regarding ownership of the master copy of the DVD. See 17 U.S.C. § 202 ("Ownership of a copyright . . . is distinct from ownership of any material object in which the work is embodied."). In this instance, ownership of the master copy of the DVD may be governed by the terms of agreements that apparently existed between Huurman, Foster and Foster's sister-in-law, as has been implied by Foster's attorney. (See Huurman Aff., Ex. G at 98). However, the record does not contain any written agreements between the women or any evidence as to the pertinent terms of such accords. The potential that unknown contractual terms may govern ownership of

29

the master copy of the DVD weighs against declaring ownership of the movie's copyright, as it raises a concern that such a judgment would not "finalize the controversy and offer relief from uncertainty" in connection with the overarching dispute between the parties about possession of the master copy of the DVD. See Duane Reade, Inc., 411 F.3d at 389.

In sum, our authority to issue declaratory relief pursuant to the Declaratory Judgment Act has not been established, and discretionary factors weigh against affording such relief. Nevertheless, even assuming that we were capable of awarding declaratory relief and that discretionary factors did not counsel against such an award, plaintiff has not demonstrated the absence of a triable dispute as to her exclusive copyright ownership, and therefore we cannot grant her summary judgment.

Copyright in a work protected under the Copyright Act "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). In any judicial proceeding, a "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Accord Boisson v. Banian, Ltd.,

273 F.3d 262, 267 (2d Cir. 2001); Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999). When one party proffers such a certificate, the burden shifts to the opposing party to show that the certificate is invalid. Moyna LLC v. Victoria's Secret Direct New York, LLC, 2003 WL 21983032, *3 (S.D.N.Y. Aug. 19, 2003) (citing In Design v. Lauren Knitwear Corp., 782 F. Supp. 824, 829 n.11 (S.D.N.Y. 1991)). A party can rebut the presumption of validity by "providing evidence of a material issue of fact concerning the copyright". Id. (citing Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995)). If the presumption of validity is overcome, the burden of proof shifts back to the party claiming the copyright to prove that it has "original and copyrightable subject matter and owns the same." Id. (citing Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 237 F. Supp. 2d 376, 381 (S.D.N.Y. 2002)).

Two or more authors may hold the copyright to a "joint work." "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The legislative history of the Act clarifies some aspects of this statutory definition. The House and Senate committee reports state that a work is "joint" if

> the authors collaborated with each other, or if each of
> the authors prepared his or her contribution with the
> knowledge and intention that it would be merged with the
> contributions of other authors as "inseparable or
> interdependent parts of a unitary whole." The touchstone
> here is the intention, at the time the writing is done,
> that the parts be absorbed or combined into an integrated
> unit.

H.R. Rep. No. 94-1476, at 120 (1976), <u>reprinted in</u> 1976
U.S.C.C.A.N. 5659, 5736; S. Rep. No. 94-473, at 103 (1975). <u>See
also</u> <u>Childress v. Taylor</u>, 945 F.2d 500, 505 (2d Cir. 1991).

The authors of a "joint work" are "co-owners of the copyright
in the work." 17 U.S.C. § 201(a). They have undivided interests in
the entire joint work, which entitle them to use or license the
work as they wish, subject to the requirement that they account to
their co-owners for any profits that accrue from their use of the
work. <u>Thomson</u>, 147 F.3d at 199. <u>Accord</u> <u>Davis v. Blige</u>, 505 F.3d 90,
98 (2d Cir. 2007); <u>Baker v. Robert I. Lappin Charitable Found.</u>, 415
F. Supp. 2d 473, 487 (S.D.N.Y. 2006). Moreover, a joint owner of a
copyright "cannot be liable to a co-owner for copyright
infringement . . . since a copyright owner cannot infringe his own
copyright." <u>Donna v. Dodd, Mead & Co.</u>, 374 F. Supp. 429, 430
(S.D.N.Y. 1974) (citing <u>Edward B. Marks Music Corp. v. Jerry Vogel</u>

<u>Music Co.</u>, 140 F.2d 266, 266-67 (2d Cir. 1944)).[16] If one joint author registers a copyright individually, the copyright is valid, but the registered owner holds the copyright in constructive trust for her co-owners. <u>Edward B. Marks Music Corp.</u>, 140 F.2d at 267.

The Second Circuit has held that, in the absence of a written agreement establishing joint authorship, "[a] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." <u>Thomson</u>, 147 F.3d at 200 (citing <u>Childress</u>, 945 F.2d at 507-08). <u>Accord</u> <u>Price v. Fox Entm't Group, Inc.</u>, 473 F. Supp. 2d 446, 454 (S.D.N.Y. 2007). To make a contribution that could be protected by an independent copyright, an author must offer more than a <u>de</u> <u>minimus</u> addition to the work. <u>Maxwood Music Ltd. v. Malakian</u>, __ F. Supp. 2d __, 2010 WL 2010936, *18 (S.D.N.Y. May 17, 2010); <u>Baker</u>, 415 F. Supp. 2d at 487. The author's contribution must be independently created and involve "some minimal degree of creativity." <u>Maxwood Music Ltd.</u>, 2010 WL 2010936, at *17 (citing <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991)). Moreover, the author must

---

[16] Joint authors also share in rights afforded to authors, such as renewal rights, that mere joint owners of a copyright do not possess. <u>See</u> <u>Childress</u>, 945 F.3d at 505.

provide more than merely an idea for the joint work, as it is well-established that "a copyright does not protect an idea, but only the expression of an idea." <u>Kregos v. Associated Press</u>, 3 F.3d 656, 663 (2d Cir. 1993). <u>Accord</u>, <u>e.g.</u>, <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989); <u>Salinger v. Random House, Inc.</u>, 811 F.2d 90, 95 (2d Cir. 1987).

To determine whether purported co-authors possess the requisite intent to qualify as joint authors under the second prong of the test, we must make a "nuanced inquiry into factual indicia of ownership and authorship" of the work at issue. <u>Thomson</u>, 147 F.3d at 201 (citing <u>Childress</u>, 945 F.2d at 508-09). The particular evidence to be weighed will vary depending on the facts of each case. <u>Id.</u> at 202 n.16 (citing <u>Childress</u>, 945 F.2d at 508). However, among the factors that may frequently be considered are "a contributor's decisionmaking authority over what changes are made and what is included in a work" <u>id.</u> at 202-03 (citing <u>Erickson v. Trinity Theatre, Inc.</u>, 13 F.3d 1061, 1071-72 (7th Cir. 1994)), "the way in which the parties bill or credit themselves" <u>id.</u> at 203 (citing <u>Childress</u>, 945 F.2d at 508), and the parties' written agreements with third parties. <u>Id.</u> at 204. Although joint authorship requires mutual intent to enter into such a relationship, joint authors need not understand the legal

34

consequences of a co-authorship arrangement. Id. at 201-02 (citing Childress, 945 F.2d at 508).

In this case, Huurman has made a prima facie showing of her exclusive copyright in the movie "Learning Chinese and English Together" by her proffer of a copyright registration certificate that lists her as the sole author of the audiovisual work and that was issued within five years of the movie's publication. (Compl., Ex. B).[17] However, the record contains material factual disputes about the contents of the registration certificate -- primarily Huurman's claim to be the sole author of the movie -- which overcome the presumption of validity created by the proffer of the certificate. Moreover, these disputed issues of fact show that Huurman has not established as a matter of law her entitlement to a judgment declaring that she holds an exclusive copyright in the movie.

To find that Huurman is the exclusive owner of the copyright for the movie "Learning Chinese and English Together", we must

_____

[17] As we have already noted, the precise publication date for the motion picture is not included in the record, supra p. 6, n.4. However, based on an advertisement for the movie that has been placed in the record we infer that it was published in 2005. (See Huurman Aff., Ex. G at 107).

determine that she and Foster were not joint authors of the work.[18] However, the record contains disputed issues of fact on the question of joint authorship which preclude such a finding. Indeed, Foster has satisfied the first requirement for joint authorship -- that she offer an independently copyrightable contribution to the work -- by having written the words and lyrics to the song that was played in the film. The independently copyrightable nature of this contribution is evidenced by the copyright certificate that she obtained for the song in 2005. (See Huurman Aff., Ex. G at 118). Foster also testified that she developed the concept for the film and created visual representations for several of the terms portrayed in the movie, and her claim is supported by a letter that she wrote to Huurman in August 2003 attaching her suggestions. (Id., Ex. G at 67-68, Ex. J at pp. 3-5). These contributions would also likely qualify as separately copyrightable additions to the audiovisual work.

---

[18] Of course, Huurman could claim sole ownership of the movie's copyright despite having been a joint author with Foster if Foster had conveyed her interest in the copyright to Huurman. However, Huurman has not asserted that any such conveyance took place, and there is no evidence to support such a transfer in the record. See 17 U.S.C. 204(a) (describing written instrument of conveyance necessary to transfer copyright ownership); Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1157-59 (S.D.N.Y. 1996) (discussing copyright transfer between joint authors).

Similarly, the record reflects a triable dispute as to the parties' intentions concerning whether to enter into a joint-authorship relationship. Regarding the parties' respective decisionmaking authority, Foster testified she often was present while Huurman edited the film, although she does not describe being actively involved in making editing decisions. (Id., Ex. G at 70). Foster also signed a so-called "model release" that waived her right to "inspect or approve the finished" film. (Id., Ex. G at 121). However, Foster claims that she received only "technical assistance" from the plaintiff, and that in fact the film reflected her "work product and ideas." (Answer at ¶ 21). This claim is supported by her deposition testimony that she "made up the whole entire story" told in the film and "set up all the shots". (Huurman Aff., Ex. G at 81). It is further bolstered by her August 2003 letter to Huurman discussing potential locations for shooting the film, and detailing the Chinese words that would be taught in the film as well as the visual representations of some of the terms. (Id., Ex. J at pp. 2-5). Unlike in other cases in which courts have rejected joint-authorship claims, there is evidence in the record from which a fact-finder could conclude that Huurman did not exercise sole decisionmaking authority over the final contents of the movie, and therefore this factor does not, as a matter of law, support Huurman's claim to exclusive ownership of the copyright.

37

See, e.g., Thomson, 147 F.3d at 203 (rejecting joint-authorship claim in part because one author of play retained sole discretion to determine whether contributions went into the script).

The second factor pertinent to divining the parties' intent to enter into a joint-authorship arrangement is how the parties billed or credited themselves. It appears that the front cover of the Chinese-language DVD itself did not include any authorship information, and we have not been provided with any other packaging that may have accompanied the DVD. (See Huurman Aff., Ex. G at 93). An advertisement for the movie on the website Amazon.com did list Huurman as the "star" and "director" of the film. (Id., Ex. G at 107). However, this billing cannot be viewed as evidence of Foster's intent regarding joint authorship, as she was not aware of the existence of the advertisement prior to her deposition in this lawsuit. (Id., Ex. G at 46). Compare Thomson, 147 F.3d at 203 (noting that purported joint author never sought equal billing). Moreover, the probative value of this billing as reflecting Huurman's joint-authorship intent is somewhat diminished by the fact that claiming to be the "star" of the movie does not necessarily equate to claiming sole authorship of the film. As the record does not contain any other evidence of how the parties billed or credited themselves, the evidence on this factor is

somewhat equivocal, and although it may support Huurman's claim of sole authorship, it would not compel a fact-finder to determine that Huurman was the sole author of the film. See Mills v. Cottrell, 2006 WL 3635325, *7 (S.D.N.Y. Dec. 8, 2006) (denying summary judgment on copyright-infringement claim in part because fact-finder could conclude that purported infringer was a co-author based on his billing as author on one release of work, despite having been denied credit or billing on the "majority" of the publicly released versions of the work).

Finally, we are to consider whether the parties' agreements with third parties shed light on their authorship intent. We have not been presented with any contracts discussing authorship of the movie, and therefore this factor cannot be dispositive on the current motion. Compare Thomson, 147 F.3d at 204 (discussing contract in which one party listed himself as the sole author and which states that he will be billed as such). We also note, however, that both Huurman and Foster signed the 2006 settlement agreement on behalf of the Baby IQ Language partnership to resolve the trademark claim by The Brainy Baby Company, LLC, which suggests that neither party felt free to act on their own in this regard. (Huurman Aff., Ex. G at 112). We also understand that both Foster and Huurman signed a contract with the company that distributed the

39

DVD, which also indicates their intent to work jointly and cooperatively in matters connected with the film. (Id., Ex. G at 25).

In sum, there is a triable dispute as to whether Huurman and Foster intended to enter into a joint-authorship relationship. That dispute precludes us from awarding Huurman summary-judgment on her request for a declaration stating that she is the exclusive owner of the copyright for the "Learning Chinese and English Together" motion picture.

### (b) Request for declaration of master DVD ownership

Reading plaintiff's complaint liberally, we also construe it to request a declaratory judgment establishing ownership of the master DVD of "Learning English and Chinese Together". In contrast to plaintiff's request for a declaration regarding ownership of the movie's copyright discussed above, our authority to award declaratory relief on this claim pursuant to the Declaratory Judgment Act is more clearly established. There is plainly an actual controversy between the parties regarding ownership of the master DVD, as Foster has requested the movie's master copy and threatened to initiate litigation to obtain it, and Huurman has

refused to provide it to her. (Huurman Aff., Ex. G at 98, 99; Compl. at "wherefore" clause on p. 14).

Moreover, we have subject-matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because, at least at the time the case was filed, plaintiff was a citizen of New York and defendant was a citizen of Pennsylvania. (Compl. at ¶¶ 1-2). The existence of the jurisdictional amount-in-controversy is somewhat less clear, as the complaint merely alleges that plaintiff faces potential liability of in excess of $75,000 if declaratory relief is not provided, without specifying the nature of this "liability." (Id. at ¶ 4). If the complaint means to allege that defendant may bring claims against plaintiff for more than section 1332's jurisdictional amount, the amount-in-controversy requirement for diversity jurisdiction is not satisfied. Correspondent Servs. Corp., 442 F.3d at 769-70 (jurisdictional amount for diversity jurisdiction over declaratory action is based on value of object that is subject of actual controversy, not value of lawsuit that declaratory judgment seeks to avoid). However, the complaint also references plaintiff's desire to sell or license the works at issue -- including the Chinese-language movie -- and therefore, again reading the complaint liberally, we interpret it to allege that the value to plaintiff of retaining the master copy of the DVD to enable her to

41

sell or license the work exceeds the jurisdictional threshold. <u>See Kheel v. Port of New York Auth.</u>, 457 F.2d 46, 49 (2d Cir. 1972) (when damages not sought, amount-in-controversy determined "from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted").

Although we have the authority under the Declaratory Judgment Act to declare the owner of the master copy of the DVD, the record evidences triable disputes pertaining to the DVD's ownership which preclude us from doing so by way of summary judgment. Indeed, it appears that ownership of the master copy may be governed by a written agreement between Huurman, Foster and Foster's sister-in-law, as was suggested in a demand letter by Foster's lawyer. (Huurman Aff., Ex. G at 22-23, 98). However, neither a copy of that agreement nor a description of its terms have been placed in the record on the current motion.

Apart from the potential existence of a written agreement addressing ownership of the master copy of the DVD, control of the master copy may depend on the terms of the partnership agreement among Huurman, Foster and Foster's sister-in-law, which also have not been described in any detail in the current record. Especially

42

pertinent is an apparent dispute between the Huurman and Foster as to whether this partnership has been dissolved and, if so, on what terms. (Id., Ex. G at 61, 116).

In short, triable factual disputes prevent us from granting summary judgment declaring the owner of the master copy of the DVD, whether as a matter of contract or partnership law.

### 2. French-language movie

Plaintiff also seeks a declaratory judgment that "the alleged 'master copy' of the French DVD does not exist." (Compl. at "wherefore" clause on p. 14). Although plaintiff concedes that in 2005 she and Foster "began making plans to prepare the . . . French DVD for distribution to the public," apparently she contends that there is no completed version of the film and seeks a declaration to that effect. (Compl. at ¶¶ 24, 30; Huurman Aff. at ¶ 29). We note that in response to Foster's May 2007 request for a copy of the French DVD as well as the "French-English-Spanish" recordings, Huurman provided her with a copy of "the French/Spanish/English audio recording" and two tapes of footage that may have been intended for use in the contemplated French and Spanish-language DVDs. (Huurman Aff., Ex. G at 103, 105). Foster's attorney

43

responded to this delivery by contending that it was "not what [Foster] was seeking" and "not what was represented would be provided to her." (Id., Ex. G at 99).

At the outset, we observe that plaintiff's requested declaration addressing the existence of the French-language DVD does not concern the "rights" or "legal relations" of the parties. It therefore is not a proper subject for declaratory relief under the Declaratory Judgment Act. See 28 U.S.C. § 2201(a).

Moreover, even if the Act authorized us to afford plaintiff the declaratory relief that she seeks, we could not do so on the current summary-judgment motion, as the record indicates a triable factual dispute between the parties regarding the status of the French-language movie. Huurman contends that no "physical 'master copy' of any 'French DVD' was ever produced." (Huurman Aff. at ¶ 29). She acknowledges that certain video and audio recordings were made in preparation for the creation of a French-language educational film, but she contends that she has already provided those materials to defendant. (Id.. See also Huurman Aff., Ex. G at 105). However, she is somewhat equivocal regarding the existence of other materials that may have been prepared for inclusion in the film, stating that apart from what she has provided defendant

44

"there is  simply nothing that defendant had any creative role in creating." (Id. at ¶ 29). Foster, for her part, asserts that there is a "master copy" of the French-language film and that it belongs to the partnership that existed between her, her sister-in-law, and Huurman. (Id., Ex. G at 30. See also id., Ex. G at 99).

In sum, not only does the parties' dispute about the existence of a master copy of the French-language film preclude us from awarding plaintiff summary judgment, but the type of judgment requested by plaintiff is unavailable under the terms of the Declaratory Judgment Act. We therefore grant summary judgment to defendant dismissing the claim. See Travelers Cas. & Sur. Co., 419 F.3d at 190-91; First Fin. Ins. Co., 193 F.3d at 114-15 (citing, inter alia, Celotex, 477 U.S. at 326).

### 3. Other intellectual property

Plaintiff also seeks a declaratory judgment that she is the exclusive copyright owner of "numerous other original creative expressions, including fashion magazine cover photographs, Internet website pictorials, and Country and Western song lyrics". In support of this request, she has attached "exemplars" of these

works to her complaint. (Compl. at ¶ 8, "wherefore" clause on p. 9 & Ex. C).

We have no authority under the Declaratory Judgment Act to award declaratory relief regarding the copyright ownership of this material, as the record does not reflect that there is an "actual controversy" between the parties on this issue. There is no suggestion that Foster has ever staked a claim to the copyrights for this largely undefined group of works, nor that Huurman has a "real and reasonable apprehension of liability" in connection with the works. See Cosa Instrument Corp., 2010 WL 1141385, at *3 (internal quotation marks omitted). Furthermore, there is no indication that Foster has evidenced any intent to use any material that might infringe on the copyright of these works. See id. at *4.

In short, given the complete absence of any "actual controversy" between the parties as to the ownership of copyrights to materials other than the Chinese and French-language movies discussed above, we are without authority to issue declaratory relief in connection with these works, and therefore deny plaintiff's request for summary judgment affording such relief. Furthermore, as plaintiff would be unable to prevail on this claim at trial as a matter of law, we grant summary judgment in

defendant's favor dismissing the claim. <u>See</u> <u>Travelers Cas. & Sur.</u> <u>Co.</u>, 419 F.3d at 190-91; <u>First Fin. Ins. Co.</u>, 193 F.3d at 114-15 (citing, <u>inter</u> <u>alia</u>, <u>Celotex</u>, 477 U.S. at 326).

### 4. Costs and attorneys' fees

Finally, plaintiff seeks reimbursement of her costs and attorneys' fees incurred in this matter. The Copyright Act affords us the discretion to "allow the recovery of full costs by or against any party other than the United States or an officer thereof" and to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505.

Plaintiff is ineligible for an award of attorneys' fees because she has not yet prevailed in this matter. In order to qualify as a "prevailing party" for a statutory award of attorneys' fees under the Copyright Act, the party must "succeed[] on a significant issue in the litigation that achieves some of the benefits the party sought in bringing suit." <u>Warner Bros. Inc. v.</u> <u>Dae Rim Trading, Inc.</u>, 877 F.2d 1120, 1126 (2d Cir. 1989) (citing, <u>inter</u> <u>alia</u>, <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983)). However, since we have denied plaintiff's summary-judgment motion targeting all of her claims for declaratory relief, and in fact

47

granted summary judgment for defendant on two of the claims, she has not yet succeeded on any issue in the suit and thus does not qualify as a prevailing party.[19]

Plaintiff's fee application also fails for a separate reason. Courts have held that pro se litigants are not entitled to statutory attorneys' fee awards for prevailing parties, even when the pro se litigants are attorneys. Kay v. Ehrler, 499 U.S. 432, 437 (1991) (pro se litigants not entitled to attorneys' fees under 42 U.S.C. § 1988); SEC v. Price Waterhouse, 41 F.3d 805, 808 (2d Cir. 1994) (pro se litigants not entitled to attorneys' fees under the Equal Access to Justice Act); Kuzma v. U.S. Postal Serv., 725 F.2d 16, 17 (2d Cir. 1984) (per curiam) (pro se litigants not entitled to FOIA statutory fee awards). Statutory fee-shifting provisions are intended to encourage parties' representation by "independent counsel," which is considered to offer advantages over self-representation, even by pro se litigants who themselves are lawyers. Kay, 499 U.S. at 437-38. Therefore plaintiff, a non-lawyer who chose to represent herself in this matter, is plainly not

---

[19] In light of this fact we need not address whether plaintiff would qualify as a prevailing party by obtaining solely declaratory relief. See Rhodes v. Stewart, 488 U.S. 1, 4 (1988).

entitled to an award of attorneys' fees under the Copyright Act.[20]
Accord Granger v. Gill Abstract Corp., 566 F. Supp. 2d 323, 332
(S.D.N.Y. 2008) (denying non-lawyer pro se litigant attorneys' fees
award under section of Copyright Act awarding attorneys' fees as
element of civil remedy available for violations of specified
sections of the Act); Wilson v. Brennan, 666 F. Supp. 2d 1242, 1263
(D.N.M. 2009) (denying pro se litigant attorneys' fees under
Copyright Act). Cf. Quinto v. Legal Times of Washington, Inc., 511
F. Supp. 579, 580-82 (D.D.C. 1981) (awarding pro se second-year law
student attorneys' fees pursuant to Copyright Act, but reducing
claimed number of hours and hourly rate).


     Furthermore, in light of plaintiff's failure to prevail on any
of her claims, her application for reimbursement of her costs
incurred in the matter must be deemed as, at the very least,
premature.

---

[20] This analysis is not affected by the fact that plaintiff's
submissions in this lawsuit were "prepared by out-of-state-
counsel" and that plaintiff has instructed us to "presume that
counsel is assisting plaintiff in connection with" all
submissions in the case. (Compl. at 1; Notice of Mot. for Summ.
J. at 2). Plaintiff's submissions indicate that she is appearing
pro se, and no counsel has entered an appearance on her behalf.
(Id.). Absent a true "attorney-client relationship" between
Huurman and counsel, which would be evidenced by counsel filing a
notice of appearance on Huurman's behalf, she is considered to be
a pro se litigant and not eligible for a statutory fee award. See
Kay, 499 U.S. at 435-36.

## CONCLUSION

For the reasons stated, we deny plaintiff's summary-judgment motion seeking various forms of declaratory relief in its entirety, and grant summary judgment to defendant on plaintiff's claims relating to the French-language movie and the other intellectual property that she has produced. We also deny plaintiff's requests for costs and attorneys' fees.


DATED:     New York, New York
           June 21, 2010


                                   _____
                                   MICHAEL H. DOLINGER
                                   UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Memorandum & Order have been mailed today to:

Ms. Karen Jeanette Huurman
133 Mulbury Street, #6W1
New York, NY 10013

Ms. Emrie Brooke Foster
P.O. Box 1227
Milford, PA 18337

50